UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 NOV 29 AM 10: 56

CLERK

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA )
)
v. ) Case No. 2:21-cr-00006
)
VARIAN LEFEBVRE, )
)
Defendant. )

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS AND REQUEST FOR A *FRANKS* HEARING**
(Doc. 28)

Pending before the court is Defendant Varian Lefebvre's motion to suppress

evidence derived from his arrest which he argues was without probable cause. (Doc. 28.)

He requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on the

grounds that the affidavit in support of the search warrant authorizing a search of his

backpack allegedly contained false and misleading information. Defendant initially also

moved to suppress two witness identifications or, in the alternative, requested a hearing

pursuant to *United States v. Wade*, 388 U.S. 218 (1967), arguing that certain

identification procedures were unduly suggestive. Because the government agreed not to

introduce this evidence in its case-in-chief, Defendant is no longer pursuing suppression

of the witness identifications.

On October 4, 2021, the court held an evidentiary hearing at which Vermont State

Police ("VSP") Trooper Jeremy Sullivan testified. Defendant filed a post-hearing

submission in support of the motion to suppress on October 25, 2021. The government

responded on November 8, 2021, at which time the court took the pending motion under

advisement.

Defendant is charged in a three-count Superseding Indictment with knowingly and

intentionally possessing with the intent to distribute heroin, a Schedule I controlled

substance, and fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C.

§§ 841(a)(1), 841(b)(1)(C) ("Count I"); knowingly possessing a firearm in furtherance of a drug trafficking crime for which he may be prosecuted in federal court in violation of 18 U.S.C. § 924(c)(1)(A) ("Count II"); and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) ("Count III").

The government is represented by Assistant United States Attorneys Jeffrey W. Davis and Paul J. Van de Graaf. Defendant is represented by Assistant Federal Public Defenders David L. McColgin and Elizabeth K. Quinn.

## I. Findings of Fact.

### A. Seizure of Defendant.

On January 17, 2021, Officer Oscar Menjivar of the Rutland City Police Department sent an email to law enforcement in the Rutland area, including Trooper Sullivan, alerting them to a tip from Federal Bureau of Investigation ("FBI") Agent Chris Destito that "a Hispanic male" was in the area selling heroin, "is in possession of a[] firearm[,]" and "has recently been threatening people with the firearm." (Gov. Ex. 14.) The man was described as "5'5['] tall and approximately 130 pounds, from the Massa[chusetts] area[,]" and "possibly nicknamed 'JR or JT'[.]" *Id.* The email urged officers to "USE CAUTION with this male." *Id.* Trooper Sullivan reviewed this email prior to his involvement in Defendant's seizure.

At approximately 8:53 a.m. on January 21, 2021, an employee of the Holiday Inn in Rutland, Vermont (the "Hotel") called 911 to report that a man wearing a gray sweatshirt and jeans with tattoos on his face had threatened two female guests with a gun in the south wing of the Hotel near room 276. The caller reported that the man was still in the Hotel's hallway. The caller added that the two female guests "just took off running . . . out the front door" of the Hotel and that the incident occurred in the Hotel's back stairwell near rooms 261 to 288. (Gov. Ex. 2 at 00:47-00:56.) The caller said the women described the man with the gun as wearing a gray sweatshirt, having a tattoo under his eye, and carrying "a Glock." *Id.* at 01:18-01:21. VSP responded to the call and issued a code advising responding officers to proceed with caution.

At approximately 8:59 a.m, Trooper Sullivan arrived at the Hotel. Prior to his arrival, he had reviewed a call detail report stating: "Subject with a gun, grey sweatshirt, jeans, tattoos on face, in hallway, alone[,]" and "threatened two females[.]" (Gov. Ex. 9.) While waiting in his police cruiser for backup, Trooper Sullivan noticed two women in a red vehicle outside the Hotel. Because the women appeared to be attempting to get his attention, Trooper Sullivan drove closer to them and spoke to them through his open window. The women reported being threatened in a stairwell of the Hotel by a man who pointed a gun at them and told them to go back to their rooms. The women said they then ran from the scene to the front desk to report the incident. They described the man as wearing a hoodie and backpack and having a tattoo below his eye. Although the women initially described the man as white, they also "describe[d] him other than just being white[.]" (Tr. 25:2-3.) The women were cooperative and provided Trooper Sullivan with personal identifying information including their names, Jessica Johnson and Monica Rickert.

Thereafter, VSP Sergeants Blake Cushing and Doug Norton arrived at the Hotel. Trooper Sullivan relayed to them the women's description of the man with the gun and advised that the women had reported seeing the man in a Hotel stairwell, where he was saying to another person something to the effect of, "You're trying to set me up with that n-word guy—drugs—whatever," and that when the man with the gun saw the women, he pointed it at them and told them to go back to their rooms. (Gov. Ex. 4 at 00:59-01:07.) The VSP troopers directed the women to leave the Hotel and go to the Rutland police station or VSP barracks in Rutland for their safety.

The three VSP troopers spoke to the Hotel employee who called 911. They then searched the Hotel but did not find the man with the gun. A guest in room 284 who opened her door as the troopers passed by her room reported hearing yelling from the direction of the stairwell approximately twenty minutes previously, although she did not see who was yelling. In response to their questions about a man with tattoos on his face, she said there was a man with facial tattoos who frequently entered and exited the Hotel via the same stairwell to visit a nearby room. The guest pointed at the Hotel's north

stairwell while talking with the troopers. Trooper Sullivan suggested to Sergeant Norton that the suspect may be the person described in Officer Menjivar's January 17, 2021 email.

VSP abandoned its search of the Hotel after approximately thirty minutes. Trooper Sullivan told Sergeants Cushing and Norton that he intended to drive to the back of the Hotel to see if the man with the gun was in the back parking lot. At approximately 9:46 a.m., as Trooper Sullivan drove along the north side of the Hotel, he saw from about fifty to seventy-five feet away a man outside the Hotel's north stairwell exit. The man, later identified as Defendant, had visible face tattoos and was wearing a grey and black jacket, a green hooded sweatshirt, a blue medical mask, and a backpack. Trooper Sullivan credibly testified that facial tattoos were unusual in his experience. When Defendant saw Trooper Sullivan, he seemed to be startled and quickly turned away and looked at his cell phone.

Trooper Sullivan radioed Sergeants Cushing and Norton and informed them he believed he had located the man with the gun. Trooper Sullivan exited his vehicle, drew his service weapon, pointed it at Defendant, and ordered him to turn around with his hands up. Defendant cooperated with these instructions. Trooper Sullivan approached Defendant, holstered his weapon, patted down Defendant's outer pockets, and did not detect anything that might be a weapon. He then attempted to handcuff Defendant to place him in "investigative detention," advising him that he was not being arrested. At this point, Sergeants Cushing and Norton arrived on the scene.

Defendant vociferously protested the removal of his backpack and the efforts to handcuff him, using profanity and asserting that his rights were being violated. The VSP troopers told him several times that they were neither arresting him nor searching his backpack but instead were detaining him because he matched the description of a suspect in a reported crime. Defendant responded by asking the troopers to bring him someone who could identify him and complaining of harassment. The VSP troopers ultimately handcuffed Defendant and took possession of his backpack and cell phone. Defendant requested to speak to a lawyer and asked for his cell phone so that he could contact one.

After Defendant was handcuffed, Sergeant Cushing took two photographs of Defendant standing next to the police cruiser. Defendant said that VSP did not have his consent to photograph him and that doing so was harassment. Defendant refused to consent to a search of his backpack. At approximately 9:53 a.m., Defendant was placed in the back of Trooper Sullivan's police cruiser and transported to the VSP barracks in Rutland.

## B. Identification of Defendant.

At the VSP barracks, Trooper Sullivan drove his police cruiser, with Defendant sitting in the back seat, past the vehicle where Ms. Johnson and Ms. Rickert were waiting, with approximately seven to eight car lengths between the vehicles. Sergeant Cushing asked which witness had the best view of the man with the gun during the incident. Ms. Johnson stated that she did, and Sergeant Cushing asked her to come inside and "look through some glass to look at him, and if you think it's him just tell ya, alright." (Gov. Ex. 7 at 00:30-00:50.) Sergeant Cushing then turned to Trooper Sullivan and said, "Can you make sure he's visible from that door" and "roll down your window and then we'll look through the door." *Id.* at 00:52-1:05.

Sergeant Cushing brought Ms. Johnson inside and led her to a door with a one-way window. With Ms. Johnson positioned at the window, Sergeant Cushing asked Trooper Sullivan to roll down the backseat window of his police cruiser. Within seconds, Ms. Johnson said, "Yes, that's him." *Id.* at 02:35. Sergeant Cushing responded, "That's him 100 percent?" to which Ms. Johnson responded, "Yes." *Id.* at 02:35-02:40. Ms. Johnson stepped back, loudly exhaled, exclaimed, "Oh, my God," and appeared to be shaken. *Id.* at 02:40-02:48. She then said, "Yeah, that's definitely him." *Id.* at 02:49-02:51. Sergeant Cushing noted the identification took place at 10:06 a.m. At the time of the show-up, VSP had a policy regarding show-ups which was apparently not followed. Trooper Sullivan was unaware of the policy at the time. He did not observe the identification of Defendant, although he drove his police cruiser into position so that an identification could be made.

Ms. Johnson and Ms. Rickert wrote witness statements regarding the incident. In her witness statement, Ms. Johnson described the man as having "face tattoos, hat rolled, tall, skinny, hoodie, Mexican/maybe c[au]casian." (Gov. Ex. 10) (emphasis in original). Ms. Rickert stated, "I only really noticed the gun. He had face tattoos and a grey sweatshirt." (Gov. Ex. 11.) Ms. Rickert further stated, "The gun was black and silver." *Id.*

At some point, Sergeant Cushing showed Ms. Johnson and Ms. Rickert the photographs of Defendant taken on the scene. The photographs depict Defendant in handcuffs, held by the arm by a VSP trooper, and standing next to a police cruiser. Both women identified Defendant from the photographs as the man who pointed the gun at them in the Hotel.

Defendant was arrested on charges of Aggravated Assault and was searched. VSP troopers found approximately $2,515.00 and sixteen grams of marijuana in his pockets.

### C. Search of Defendant's Backpack.

Later on January 21, 2021, Trooper Sullivan obtained a search warrant for Defendant's backpack. His affidavit in support of the search warrant states in full: [1]

1.      On January 21st, 2021, at about 8:53 AM, Vermont 911 received a call from the Holiday Inn, 475 Holiday Drive, Rutland, Vermont, reporting two female guests had been threatened by a male with a firearm. The initial dispatch notes of the call indicated the subject with a gun was wearing a grey sweatshirt, jeans, had tattoos on his face, and was in a hallway, alone.

2.      I responded to the Holiday Inn, and met with, Monica Rickert (DOB:(Redacted)), and Jessica Johnson (DOB:(Redacted)). Both reported they were threatened by a male who pointed a gun at them inside the hotel stairwell.

3.      Rickert advised she and Johnson were walking down the second story hallway of the Holiday Inn toward the stairwell. Rickert observed a man who appeared to have darker than white skin however, not a black male and tattoos on his face, wearing a hoodie and a backpack, talking to someone in the stairwell. As Rickert and Johnson got closer to the stairwell this male turned around, saw them coming, and pointed a firearm in their direction. The male told them to go back to their room. Rickert stated she and Johnson turned around and ran to the front desk to report what just

---

[1] The affidavit is reproduced verbatim without corrections of any typographical or grammatical errors.

happened. Both Rickert and Johnson stated to me they felt threatened.

4.     Sgt. Doug Norton, Sgt. Blake Cushing, and I checked the Holiday Inn for this male but were unable to locate him in any of the common areas or hallways. During our investigation we located the corridor and stairwell where we believe the incident took place. While knocking on doors, an identified concerned citizen came out of her room and stated she heard a lot of yelling and commotion taking place shortly before our arrival. Sgt. Cushing asked if she had seen a male with face tattoos and she advised yes, and he uses that stairwell all the time. The stairwell she pointed to was the north stairwell exit.

5.     Rickert and Johnson consent to law enforcement checking their hotel room, Room 270. I entered their room and was unable to locate anyone else inside.

6.     After a search of the hotel common areas, I was unable to locate the male. Around 9:46 AM, I drove my marked Vermont State Police to the north side parking lot of the Holiday Inn and observed a male exiting the north stairwell at the ground level door. This male was later identified as Varian LEFEBVRE, DOB:(Redacted), of Holyoke, Massachusetts.

7.     I saw LEFEBVRE was wearing a grey hoodie sweatshirt, a blue-colored medical face covering, had several face tattoos visible, and was carrying a backpack over his shoulder(s). As I got closer, I saw LEFEBVRE appeared to be Hispanic. As he looked towards me and my cruiser, I saw he appeared to jump or startle. He quickly turned his back towards me and began looking at his phone.

8.     I stopped my cruiser, exited, and approached LEFEBVRE, ordering him to show his hands. I conducted a pat search of his outer clothing and did not locate anything I believed was a firearm or weapon. I attempted to place LEFEBVRE into investigative detention by handcuffs but found his backpack was in the way. As I tried to remove his backpack, he clinched both of his hands together and began yelling that law enforcement could not search him. This action initially prevented me from placing LEFEBVRE into handcuffs. During this process, LEFEBVRE was yelling very loud and causing a disturbance. At one point, a Hotel patron, opened their window, and yelling at LEFEBVRE to stop yelling. Eventually, with the assistance of another trooper, I was able to remove the backpack by unfastening the straps and place LEFEBVRE into handcuffs. LEFEBVRE continued to yell and be aggressive.

9.     I noted that LEFEBVRE had tattoos on his face including "La Familia" above right eyebrow, and the number "5" between eyebrows.

10.     I asked LEFEBVRE for permission to search him and his backpack;

he refused. At or about 9:53 AM, LEFEBVRE was placed in a police vehicle and transported to the Vermont State Police barracks, Rutland, Vermont. LEFEBVRE remained inside the police cruiser which was parked outside the police barracks.

11.     At approximately 10:05 AM, Johnson arrived at the State Police barracks. Johnson was provided the opportunity to view LEFEBVRE, who was still seated in the police vehicle. Johnson looked through the vehicle's window, showed a physical reaction and stated that "that's 100% him, positively identifying LEFEBVRE as the male who pointed the firearm at her. Johnson and Rickert were also showed a photo of LEFEBVRE taken on scene. Both confirmed that was the same male who pointed a firearm at them in the stairwell.

12.     Following this identification, LEFEBVVRE was arrested for Aggravated Assault and was brought into the state police barracks and searched. I located approximately $2515.00 in various denominations and approximately 16 grams of suspected marijuana within his pockets. While being brought into the barracks, LEFEBRE stated that "she" [the female who made the identification] did not even see him because he was wearing a mask.

13.     LEFEBVRE's backpack, which had been removed from him at the Holiday Inn parking lot, was placed in my police cruiser, and transported to the state police barracks. The backpack has remained secured in my state police vehicle since that time. The backpack was grey with blue stripes and said "AGAVE32" on the outside of the fabric.

14.     At or about 12:00 PM, I opened the doors to my police vehicle, which had been parked with the windows and doors closed. I noted a strong smell of marijuana within the vehicle. This smell was not present before the backpack was placed in my cruiser.

Rickert provided a sworn written statement which states the following (sic):

> "This morning my girlfriend and I were walking out to go to my mothers. When we entered the stairs there was a man with a gun on the middle platform. He had the gun pointed at someone at the bottom of the stairs. Ince the man saw us he pointed the gun at us and told us to go back to our room. We ran to the front desk to report it. We ran to taco bell after reporting it for safety and called my mother to come get us.
>
> Q: Describe the person you saw?
> A: I only really noticed the gun he had face tattoos and a grey sweatshirt.
>
> Q: Describe the gun?

8

A: The gun was black and silver.

Q: Have you ever seen the person before?
A: No.

Q: When the gun was pointed at you how did that make you feel?
A: I ran for my life. I fell down the stairs running so fast."

END OF STATEMENT

15.    Johnson also provided a sworn written statement which states the following (sic):

"Me and my girlfriend where leaving to go to her mothers house and upon leaving our room to og we entered the hallway coming face to face w/ a man and a gun. Initially the gun was pointed @ another individual @ the bottom of the stairs. When he saw us he pointed the gun @ us and my girlfriend telling us to go back into our room. So we ran down the stairs to the front desk to report the problem. Was very worried about my girlfriend she is shooken up.

Q: Describe the person you saw?
A: Face tattoos, hat, tall, skinny, hoodie

Q: Describe the gun?
A: Black handled Glock

Q: Have you ever seen him before?
A: No never in my life!

Q: When the gun was pointed at you ho did you feel?
A: When the man pointed the gun @ me I honestly was afraid more for my girl as she hasn't ever really been exposed to such behavior. I was very, very scared.

Q: Whad do you mean by scared?
A: I feared for our lives

END OF STATEMENT

16.    Attached is two photos taken of LEFEBVRE on scene which were showed to both Johnson and Rickert.

17.    Based on my training and experience, I know that people who possess firearms commonly possess ammunition for those firearms. I also know that backpacks, like the one described herein, often have internal pockets and multiple places to conceal items such as handguns and ammunition.

18.    I am requesting an anytime exception to the warrant requirement based upon the fact the backpack is in law enforcement custody and

9

LEFEBVRE is currently being detained pending further investigation.

19.     Based upon the aforementioned information, I believe that there is probable cause to believe there is a firearm and ammunition, and marijuana inside the backpack seized from LEFEBVRE.

(Gov. Ex. 12) (alterations in original) (photographs omitted). The affidavit included two color photographs of Defendant taken at the scene.

After the search warrant was issued at approximately 4:00 p.m. that same day, VSP searched Defendant's backpack and located a loaded black Springfield Arms model XD .45 caliber pistol with silver around the end of the barrel; eight rounds of .45 caliber ammunition; approximately 220 bags of a substance which field tested positive for fentanyl; and several pieces of mail addressed to an individual with the initials J.R. at an address in Holyoke, Massachusetts.

At approximately 5:30 p.m., Detective Sergeant Jeffrey Stephenson told Defendant that VSP had executed a search warrant for his backpack and that "they found some items in that backpack that obviously are pretty concerning, okay?" (Gov. Ex. 8 at 7:25:00-7:25:19.) Defendant responded: "I just found that backpack in the trash." *Id.* at 7:25:19-7:25:23.

Defendant's October 4, 2021 affidavit asserts that he had an expectation of privacy in his backpack and its contents at the time of his seizure by VSP on January 21, 2021 and that he manifested this expectation of privacy by refusing to consent to a warrantless search of his backpack. (Defendant's Ex. O.)

The FBI obtained a search warrant to search Defendant's cellphone on February 4, 2021 and has seized evidence pursuant to that warrant.

**II.     Conclusions of Law and Analysis.**

**A.     Whether the Seizure of Defendant Was Reasonable.**

Defendant argues that Trooper Sullivan's initial stop was not supported by reasonable suspicion and became an illegal *de facto* arrest without probable cause when he was subsequently handcuffed. He seeks to suppress evidence recovered from his backpack as the fruits of that seizure. In response, the government argues that Trooper Sullivan had probable cause to arrest Defendant from the time he was stopped or,

alternatively, reasonable suspicion to detain Defendant subject to further investigation, including identification by witnesses. The government does not concede Defendant was arrested prior to being identified at VSP barracks; however, it "has chosen not to argue that the transportation to the barracks was part of a lawful investigatory detention, but the question is close, particularly here where [Trooper] Sullivan advised [Defendant] that he was not arresting him but was detaining him for further investigation." (Doc. 56 at 9.)

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Police stops fall into two categories: arrests and *Terry* stops." *Grice v. McVeigh*, 873 F.3d 162, 166–67 (2d Cir. 2017).

"[A]n officer may conduct a brief investigatory detention (commonly known as a '*Terry* stop') as long as the officer has reasonable suspicion 'that the person to be detained is committing or has committed a criminal offense.'" *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (quoting *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014)); *see also Terry v. Ohio*, 392 U.S. 1 (1968). An investigatory stop must be supported by "specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing[.]" *Bailey*, 743 F.3d at 332 (internal quotation marks and citations omitted). Reasonable suspicion demands "less than probable cause, requiring only facts sufficient to give rise to a reasonable suspicion that criminal activity 'may be afoot' and that the person stopped 'may be armed and presently dangerous.'" *Id.* (emphasis omitted) (quoting *Terry*, 392 U.S. at 30). Probable cause, in contrast, requires that "the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008) (internal quotation marks and citation omitted).

In "evaluating the reasonableness of an investigative stop[,]" courts examine "'whether the officer's action was justified at its inception, and whether it was reasonably

related in scope to the circumstances which justified the interference in the first place.'" *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (quoting *Terry*, 392 U.S. at 20). "A *Terry* stop is limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place." *Grice*, 873 F.3d at 167 (citations omitted). "If an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a *de facto* arrest that must be based on probable cause." *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992).

> In general, to determine whether a *Terry* stop is so intrusive as to become an arrest, we look to: the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.

*Grice*, 873 F.3d at 167 (internal quotation marks and citation omitted).

"Whether an officer's suspicion is 'reasonable' is an objective inquiry based on the totality of the circumstances as they would appear through the eyes of a reasonable and cautious police officer, guided by his experience and training." *Id.* (citing *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015)). An officer's subjective intent to make an investigatory stop rather than an arrest, or vice versa, does not affect the analysis. *See Whren v. United States*, 517 U.S. 806, 814 (1996) ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent.") (emphasis in original); *United States v. Weaver*, 9 F.4th 129, 145 (2d Cir. 2021) ("The Supreme Court has long rejected any attempt to inject subjectivity into the Fourth Amendment context.").

### 1. Whether the Initial Seizure of Defendant Was Supported by Reasonable Suspicion.

"A seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained." *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009) (citing *United States v. Swindle*, 407 F.3d 562, 572 (2d Cir.2005)); *see also California v. Hodari D.*, 499 U.S.

621, 626 (1991) (holding "submission to the assertion of authority" constitutes a seizure under the Fourth Amendment). Defendant was therefore seized when he complied with Trooper Sullivan's instructions to turn around with his hands up. The initial question is whether that seizure was "justified at its inception[.]" *Terry*, 392 U.S. at 20. The court finds that it was.

At the time of Defendant's seizure, Trooper Sullivan had reviewed a FBI tip that "a Hispanic male" in the area selling heroin and "threatening people with the firearm[,]" (Gov. Ex. 14), and a 911 tip reported to dispatch that described a suspect "with a gun, grey sweatshirt, jeans, tattoos on face, in hallway, alone[,]" who had "threatened two females[.]" (Gov. Ex. 9). A 911 tip may provide reasonable suspicion if it "exhibits sufficient indicia of reliability" and is "suitably corroborated[.]" *Simmons*, 560 F.3d at 104 (2d Cir. 2009) (quoting *Florida v. J. L.*, 529 U.S. 266, 270 (2000) (internal quotation marks omitted)); *see United States v. Colon*, 250 F.3d 130, 134-35 (2d Cir. 2001) (holding responding police may rely on 911 tip to the extent communicated in dispatch report); *see, e.g., Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 421 (S.D.N.Y. 2002) (finding reasonable suspicion where officer relied in part on "the 911 dispatcher's report"). "[A]n anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality." *Simmons*, 560 F.3d at 105. The 911 call here reported an ongoing emergency of a man threatening guests with a firearm in the Hotel. The caller identified herself, advised dispatch of the basis of her information, and confirmed that, as far as she knew, the man was still in the Hotel.

Thereafter, Trooper Sullivan spoke to Ms. Johnson and Ms. Rickert, who described having a handgun pointed at them in the Hotel's north stairwell by a man wearing a hoodie and a backpack with tattoos on his face. They recounted a conversation between the man with the firearm and another person in the stairwell that appeared to be related to drug trafficking activity. Ms. Johnson and Ms. Rickert thus "corroborate[d] allegations of criminal activity [from the FBI tip and in the dispatch report] in [a] meaningful way[,]" *Simmons*, 560 F.3d at 105, and provided an independent basis for

13

reasonable suspicion. *See Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("[A]n identified citizen informant is presumed to be reliable.") (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 165 (2d Cir. 2002) (internal quotation marks omitted).

A Hotel guest provided additional facts consistent with Ms. Johnson's and Ms. Rickert's information by advising she had heard yelling from the direction of the Hotel's north stairwell and that a man with face tattoos frequently used the stairwell to access a room in the Hotel. *See id.* ("[I]nformation provided by 'an identified bystander with no apparent motive to falsify' has 'a peculiar likelihood of accuracy[.]'") (quoting *Caldarola*, 298 F.3d at 163). "Even if these are innocent details, we look to these other facts, because if [an informant] was truthful about some part of the story, there is a higher probability the incriminating facts are true[.]" *United States v. Canfield*, 212 F.3d 713, 720 (2d Cir. 2000) (citing *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983) ("[I]nnocent behavior frequently will provide the basis for a showing of probable cause[.]")).

Along the north side of the Hotel, Trooper Sullivan observed a man with tattoos on his face, a gray jacket over a hoodie, and a backpack exit the Hotel's north stairwell less than an hour after the report of a man with a gun in the stairwell. Upon seeing Trooper Sullivan, who was in uniform in a marked police cruiser, the man startled and turned away. *See Weaver*, 9 F.4th at 147 ("Unusual, evasive, or furtive behavior, especially in the presence of law enforcement, is often a critical factor in the reasonable suspicion analysis."); *United States v. Gonzalez*, 441 F. App'x 31, 35 (2d Cir. 2011) (finding probable cause to arrest because, among other things, defendant "immediately changed directions and walked away from the police car" after noticing police); *cf. Dancy v. McGinley*, 843 F.3d 93, 110 (2d Cir. 2016) (finding no reasonable suspicion in part because defendants had not "appeared nervous, attempted to conceal anything, changed direction, ran away, quickened their pace, or made furtive gestures").

At the time of Defendant's initial seizure, Trooper Sullivan possessed "specific and articulable facts which, taken together with rational inferences from those facts," provided reasonable suspicion that "criminal activity may be afoot" and that Defendant may be "armed and presently dangerous." *Bailey*, 743 F.3d at 332 (internal quotation

marks and citations omitted). Therefore, the initial seizure of Defendant was "justified at its inception[.]" *Terry*, 392 U.S. at 20.

## 2. Whether the Investigatory Stop Was Reasonable in Scope.

Because Trooper Sullivan had reasonable suspicion to stop Defendant, the inquiry turns to "whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. "The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "[T]he nature and quality of the intrusion on the individual's Fourth Amendment interests" must be balanced "against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983).

Trooper Sullivan made his initial stop of Defendant with his weapon drawn. He then holstered his weapon and patted down Defendant for weapons but found none. When he attempted to handcuff Defendant, he was met with verbal resistance. At this juncture, Defendant alleges the stop exceeded the permissible scope of an investigatory stop and ripened into an arrest. The court disagrees.

"There are no hard and fast rules for evaluating the conduct of law enforcement agents conducting investigative stops." *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990). "A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." *Id.* "Thus, where an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a *de facto* arrest." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (alteration in original) (quoting *Terry*, 392 U.S. at 24). "This doctrine has supported a range of restraints incident to a stop, from the pat-down at issue in *Terry*, to the drawing of firearms, to the use of handcuffs[,]" *id.* (citations omitted) (collecting cases), even though those restraints are "ordinarily not incident to a *Terry* stop, and tend[] to show that

15

a stop has ripened into an arrest[,]" *Grice*, 873 F.3d at 167.

Because Trooper Sullivan had a reasonable basis to believe that Defendant was armed and potentially dangerous, pointing his service weapon for a matter of seconds before holstering it upon Defendant's cooperation with his orders, patting Defendant down for weapons, and then placing Defendant in handcuffs so that he could not access his backpack were reasonable measures to ensure officer safety consistent with the Fourth Amendment. *See United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) ("[Law enforcement agents] had every reason to believe that [defendant] was dangerous. Certainly it was reasonable for the agents to have their weapons drawn upon their initial contact."); *United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) ("[A]lthough under ordinary circumstances, drawing weapons and using handcuffs are not part of a *Terry* stop, intrusive and aggressive police conduct is not an arrest when it is a reasonable response to legitimate safety concerns on the part of the investigating officers.") (internal quotation marks and citation omitted); *United States v. Fiseku*, 915 F.3d 863, 872 (2d Cir. 2018) ("[W]e have previously found that officers acted reasonably in using handcuffs when they acted based on reliable information that a suspect was armed and possibly dangerous.") (collecting cases).

Although a pat-down did not reveal weapons on Defendant's person, it did not negate the possibility that a firearm would be found in Defendant's backpack. "[T]he Supreme Court has 'expressly recognized' that 'suspects may injure police officers and others by virtue of their *access* to weapons, even though they may not themselves be armed.'" *Fiseku*, 915 F.3d at 871 (emphasis in original) (quoting *Michigan v. Long*, 463 U.S. 1032, 1048 (1983)). "[U]nder the circumstances, handcuffing was a less intimidating—and less dangerous—means of ensuring the safety of everyone on the premises than holding [Defendant] at gunpoint[.]" *Newton*, 369 F.3d at 675.

After Defendant was handcuffed, he was photographed and transported in Trooper Sullivan's police cruiser to the VSP barracks in Rutland in order to be identified by Ms. Johnson and Ms. Rickert, who had been directed to wait there. Citing *Dunaway v. New York*, 442 U.S. 200 (1979), Defendant argues that a seizure followed by transportation to

16

a police station is "indistinguishable from a traditional arrest." (Doc. 55 at 2) (quoting *Dunaway*, 442 U.S. at 212) (internal quotation marks omitted). The facts in the instant case, however, are distinguishable from *Dunaway*, where "[t]he pertinent facts relied on by the [Supreme] Court . . . were that (1) the defendant was taken from a private dwelling; (2) he was transported unwillingly to the police station; and (3) he there was subjected to custodial interrogation resulting in a confession." *Sharpe*, 470 U.S. at 684 n.4. Defendant was not seized in a private dwelling but was taken from an outdoor parking lot of a business open to the public. His participation in the identification may have been non-consensual, but a brief identification was necessary to confirm or dispel the need for his continued seizure. *United States v. McCargo*, 464 F.3d 192, 198 (2d Cir. 2006). After being told he was being detained but not arrested as a suspect in a crime, Defendant specifically asked officers to bring him someone who could identify him. Defendant was brought to the VSP barracks where Ms. Johnson and Ms. Rickert had been directed to wait.

In general, police must "diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly[.]" *Sharpe*, 470 U.S. at 686. "[I]t is well established that officers may ask (or force) a suspect to move as part of a lawful *Terry* stop." *United States v. Gori*, 230 F.3d 44, 56 (2d Cir. 2000). "[P]olice may reasonably choose to transport the suspect in a police car where . . . that decision would shorten the length of the Fourth Amendment intrusion." *McCargo*, 464 F.3d at 199. In *McCargo*, the Second Circuit held it was "reasonable for the police to decide to extend the *Terry* stop briefly to transport [defendant] to the crime scene to see whether he could be identified by the victim." *Id.* at 198. The Second Circuit noted its holding was "consistent with the views of three of our sister courts of appeals and several state supreme courts in holding that the police may transport a suspect for identification purposes as part of a *Terry* stop." *Id.* at 199.

The transportation and show-up here "immediately confirmed or dispelled whether [Defendant] was a suspect" and were reasonable "both by way of resolving the suspicion surrounding [Defendant] and impinging as little as possible on his Fourth Amendment

rights." *Id.* at 198-99. For those same reasons, photographing Defendant was a reasonable investigative technique. *See United States v. Cavallo*, 2007 WL 4373254, at *3 (E.D.N.Y. Apr. 20, 2007) (holding photographing suspect for identification purposes during investigatory stop was "reasonably related in scope to the circumstances which justified the interference in the first place").

"It is true that alternative means of confirming or dispelling the suspicion surrounding [Defendant] might have existed." *McCargo*, 464 F.3d at 198; *see also Sharpe*, 470 U.S. at 686–87 ("A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished."). The VSP troopers could have brought Ms. Johnson and Ms. Rickert back to the Hotel, relied exclusively on the photographs for identification, or removed the handcuffs once Defendant was in the police cruiser, but "[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Sharpe*, 470 U.S. at 687. "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id.* at 686.

The VSP troopers here were in a "swiftly developing situation," attempting to confirm whether an armed and dangerous man was still at large in the Hotel. *Id.* They "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly[.]" *Id.* Only twenty minutes elapsed between the initial stop of Defendant and his identification at the VSP barracks. *See Grice*, 873 F.3d at 168 ("[T]hirty-three minutes was not an unreasonable interval to keep the handcuffs on while officers and a dog searched the tracks for a potential bomb."); *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) ("We decline to hold that a thirty minute detention based on reasonable suspicion is, *per se*, too long.") (collecting cases). The involvement of three troopers was not excessive in light of the danger presented, and it would constitute "unrealistic second-guessing[,]" *Sharpe*, 470 U.S. at 686, to conclude handcuffs were no longer necessary after Defendant, who had resisted his apprehension, was placed in the

18

police cruiser. *See United States v. Foster*, 891 F.3d 93, 106-07 (3d Cir. 2018) (holding it was reasonable to transport handcuffed suspect "very short distance" in police cruiser for "identification purposes"); *Halvorsen v. Baird*, 146 F.3d 680, 684–85 (9th Cir. 1998) (holding driving handcuffed suspect to a nearby gas station for questioning during investigatory stop was reasonable).

At each step of the approximately twenty-minute detention, VSP troopers acted reasonably to keep themselves and others safe and worked diligently to confirm or dispel whether Defendant was a suspect in a serious crime. Because the "'nature and quality of the intrusion on [Defendant's] Fourth Amendment interests'" were properly balanced "'against the importance of the governmental interests' at stake," the investigatory stop was reasonable under the Fourth Amendment. *Tehrani*, 49 F.3d at 62 (quoting *Place*, 462 U.S. at 703).

Defendant's subsequent arrest was supported by ample probable cause. Ms. Johnson identified Defendant with a high degree of certainty. "It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity[.]" *Panetta*, 460 F.3d at 395 (internal quotation marks and citations omitted) (alterations adopted). Ms. Johnson's identification was in addition to the facts known to Trooper Sullivan at the time of the initial seizure, including a FBI tip, a 911 call reporting a man with a firearm threatening guests at a hotel, Ms. Johnson's and Ms. Rickert's description of being threatened by a man in the Hotel's north stairwell, a report from a bystander that a man with tattoos on his face routinely used the Hotel's north stairwell, the discovery of Defendant outside that stairwell, and a close match between Defendant's clothing and Ms. Johnson's and Ms. Rickert's description of the suspect's clothing. Under the "totality of the circumstances," there was "sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense ha[d] been . . . committed by [Defendant]." *Valentine*, 539 F.3d at 93 (internal quotation marks and citation omitted). Because Defendant's arrest was supported by probable cause, *see id.*, no Fourth Amendment violation may be

found. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Defendant's motion to suppress must therefore be DENIED. (Doc. 28.)

### B.     Whether Defendant Is Entitled to a *Franks* Hearing.

Defendant requests a *Franks* hearing because Trooper Sullivan's affidavit in support of the search warrant application for Defendant's backpack allegedly contains material misrepresentations and omissions. "A *Franks* hearing permits a criminal defendant to challenge the veracity of a warrant affidavit under certain circumstances." *United States v. McKenzie*, 13 F.4th 223, 236 (2d Cir. 2021). "There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). To overcome that presumption and "trigger [a] hearing, a defendant must make a 'substantial preliminary showing' that (1) the warrant application contains a false statement, (2) the false statement was included intentionally or recklessly, and (3) the false statement was necessary to the finding of probable cause." *McKenzie*, 13 F.4th at 236 (citing *Franks*, 438 U.S. at 155-56; *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987)). "[M]aterially misleading omissions as well as misrepresentations may be challenged by the defense." *Levasseur*, 816 F.2d at 43.

> [T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Franks*, 438 U.S. at 171.

To determine whether the allegedly false statement was necessary to the finding of probable cause, the court engages in "a process of subtraction" whereby it "disregard[s] the allegedly false statements and determine[s] whether the remaining portions of the affidavit would support probable cause to issue the warrant." *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003) (citation omitted). For omissions, the court "insert[s] the

20

omitted truths[.]" *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (citation omitted). "[T]he defense motion must be denied without a hearing if, after setting aside the allegedly misleading statements or omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *Levasseur*, 816 F.2d at 43 (quoting *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)).

Defendant contends that the affidavit of Trooper Sullivan contains four material misrepresentations as well as several material omissions. The government argues that none of these alleged misrepresentations or omissions, together or individually, constitute the "substantial preliminary showing[,]" *Franks*, 438 U.S. at 155, required to trigger an evidentiary hearing.

The first alleged misrepresentation is: "[Ms.] Rickert observed a man who appeared to have darker than white skin however, not a black male and tattoos on his face[.]" (Gov. Ex. 12 at ¶ 3.) Defendant asserts that Trooper Sullivan altered Ms. Rickert's description from a white male with a tattoo below his eye to a "darker than white skin however, not a black male" with "tattoos on his face" to more closely match Defendant's appearance. *Id.* Trooper Sullivan's uncontroverted testimony establishes that "darker than white skin however, not a black male[,]" *id.*, is an accurate representation of how Ms. Rickert described the perpetrator to him at the Hotel. While "tattoos on his face," *id.*, may be an imprecise paraphrase of Ms. Rickert's description of a tattoo under his eye, it is not "materially misleading[.]" *Levasseur*, 816 F.2d at 43. In addition to eyewitness descriptions, the search warrant affidavit included descriptions of the perpetrator from the dispatch call, the sworn statements of Ms. Rickert and Ms. Johnson, and two photographs of Defendant. Based upon this evidence, the judge who considered the search warrant application could decide for himself whether Trooper Sullivan's description of Defendant's skin color and tattoos was accurate.

The second misrepresentation alleged by Defendant is the description of his apparel as "a grey hoodie sweatshirt," when he was wearing a green hoodie with a grey and black jacket over it. (Gov. Ex. 12 at ¶ 7.) Defendant asserts Trooper Sullivan misrepresented Defendant's clothing so that it would correspond to Ms. Rickert's

21

description of the man with the gun wearing a grey sweatshirt. The government counters that Trooper Sullivan did not mislead the judge because he included two color photographs of Defendant which showed his clothing. Whether a fleece zip-up is called a jacket or sweatshirt and whether a hood is separate or attached to it is immaterial to the probable cause determination. The two color photographs clearly depict Defendant's apparel. Defendant therefore fails to demonstrate that Trooper Sullivan's description of Defendant as wearing "a grey hoodie sweatshirt," *id.*, was intentionally or recklessly false or necessary to the probable cause determination.

The third alleged misrepresentation is Trooper Sullivan's description that Ms. Johnson "showed a physical reaction and stated that 'that's 100% him[']," during the show-up identification, which Defendant suggests misrepresented Ms. Johnson's degree of certainty. (Gov. Ex. 12 at ¶ 11.) While Ms. Johnson never specifically said, "That's 100% him," the affidavit does not misrepresent her level of certainty because when Sergeant Cushing asked her, "That's him 100 percent?" Ms. Johnson responded, "Yes." Gov. Ex. 7 at 2:35-2:40.) She then said, "Yeah, that's definitely him." *Id.* at 2:49-2:51. Ms. Johnson appeared shaken, stepped back, loudly exhaled, and exclaimed "Oh, my God." *Id.* at 02:40-02:48. Because Trooper Sullivan accurately stated that Ms. Johnson "positively identif[ied]" Defendant, (Gov. Ex. 12 at ¶ 11), accurately described her degree of certainty, and accurately described her physical reaction, there was no material misrepresentation of operative fact.

The fourth alleged misrepresentation is Trooper Sullivan's description of Defendant's statement, made as he was brought into the police station, "that 'she' [the female who made the identification] did not even see him because he was wearing a mask." (Gov. Ex. 12 at ¶ 12) (alteration in original). Defendant argues this misrepresentation was intended to mislead the judge into believing this was an admission to possessing a firearm in the Hotel's stairwell rather than a complaint about problems with the show-up identification. The statement is ambiguous but was not necessary to the finding of probable cause. Construed as a complaint about the identification procedure, it is irrelevant to the probable cause determination. Construed as an admission by

Defendant, it is only one of many pieces of evidence that Defendant was present at the Hotel at the time of the alleged crime, including the fact that Defendant was seized in the Hotel's parking lot shortly after the report of an assault. Even without his statement, there thus remains a "residue of independent and lawful information sufficient to support probable cause." *Levasseur*, 816 F.2d at 43 (quoting *Ferguson*, 758 F.2d at 849).

Defendant further contends that Trooper Sullivan omitted material information about the show-up identification, including that Defendant was handcuffed in a police cruiser when it took place. There is, however, no evidence the handcuffs were visible to Ms. Johnson during her identification, and, in any event, the search warrant affidavit clearly indicates Defendant was handcuffed. Trooper Sullivan averred that he "place[d] [Defendant] into handcuffs[,]" (Gov. Ex. 12 at ¶ 8), then "placed [him] in a police vehicle and transported [him] to the Vermont State Police barracks, Rutland, Vermont[,]" *id.* at ¶ 10, where Defendant "remained inside the police cruiser which was parked outside the police barracks." *Id.* Ms. Johnson was then "provided the opportunity to view [Defendant], who was still seated in the police vehicle." *Id.* at ¶ 11.

Finally, Defendant argues that it was misleading for Trooper Sullivan to omit that he was unfamiliar with VSP identification guidelines and that those guidelines were not followed. Defendant fails to identify or present any evidence that Trooper Sullivan knew of the VSP guidelines or knew they were not followed.[2] Moreover, "[a] magistrate issuing a warrant reviews affidavits for probable cause, not the methods by which the officers arrived at the facts presented." *United States v. O'Neal*, 17 F.3d 239, 242 n.6 (8th Cir. 1994) (citing *United States v. Leon*, 468 U.S. 897, 921 (1984)).

Because Defendant has not shown that the allegedly false statements or misleading omissions were "necessary to the finding of probable cause[,]" *McKenzie*, 13 F.4th at 236, he has not made the required "substantial preliminary showing[,]" *Franks*, 438 U.S. at 155, and his request for a *Franks* hearing must be DENIED.

---

[2] Even if Trooper Sullivan should have known, "[a]llegations of negligence" are insufficient to merit a hearing. *Franks*, 438 U.S. at 171.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress physical evidence and request for a *Franks* hearings are DENIED. (Doc. 28.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 29ᵗʰ day of November, 2021.

Christina Reiss, District Judge
United States District Court